## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **National Association of Professional Allstate Agents, Inc.**, an association, **Scott Verbarg**, an individual, **Ross Shales**, an individual, **Brad Rehonic**, an individual, and **Joseph Rehonic**, an individual,<br><br>*Plaintiffs*,<br><br>   *v.*<br><br>**Allstate Insurance Company**,<br><br>*Defendant.* | **Civil Case No.** |

## Complaint for Declaratory Relief, Injunctive Relief, and Monetary Relief

Plaintiffs National Association of Professional Allstate Agents, Inc. ("**NAPAA**"), Scott Verbarg, Ross Shales, Brad Rehonic, and Joseph Rehonic complain as follows:

## Introduction

1. This is a civil action for declaratory relief, injunctive relief, and monetary damages based on eleven counts of breach of contract.

2. This action concerns Defendant Allstate Insurance Company's ("**Allstate**") breach of the Allstate R3001 Exclusive Agency Agreement and its integrated documents against Exclusive Agent members of Plaintiff NAPAA, directly harming NAPAA's members. This action also concerns Allstate's breach of the Agreement against individually named Allstate Exclusive Agents.

**Compl. for Inj.,**
**Decl., and Monetary Relief**      1

## Jurisdiction and Venue

3. This action arises under the common law of the State of Illinois to redress contractual rights. Illinois law applies here because the contract in question has no choice of law provision and Defendant Allstate has its corporate headquarters and principal place of business in the State of Illinois.

4. This Court has original subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter is between citizens of different States and the matter in controversy exceeds $75,000.

5. This Court has the authority to provide declaratory relief under 28 U.S.C. §§ 2201 and 2202 and under Rule 57 of the Federal Rules of Civil Procedure. This Court has authority to provide preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure. This Court has the authority to provide monetary damages under applicable Illinois law.

6. This Court has personal jurisdiction over Defendant because it is a corporation domiciled in the State of Illinois or it has otherwise made and established contacts within the State to permit the exercise of personal jurisdiction over it.

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district and is subject to this Court's personal jurisdiction under 28 U.S.C. § 1391(c)(1) . Further, Defendant resides in Cook County, so venue is proper in this division of this district.

## Parties

8. NAPAA is a membership association, incorporated as a non-profit corporation under the laws of the State of New York. NAPAA is dedicated to the success of Allstate Exclusive

**Compl. for Inj.,**
**Decl., and Monetary Relief**               2

Agency Owners ("**EA(s)**") and to advance the independence and entrepreneurial spirit of its members. It advocates on behalf of EAs and has supported consumer friendly legislation, including opposition to the inappropriate use of credit scoring and advocating the abolishment of redlining. NAPAA has more than 1000 members, including active and retired Allstate EAs, all of whom have or had a contractual relationship with Allstate. NAPAA has associational standing to bring suit on behalf of its members pursuant to the qualifications set forth in *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (holding organization has associational standing, and may bring suit on behalf of its members, when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit). Plaintiff NAPAA bring Counts I - IV to this action.

9. Plaintiff Scott Verbarg was an EA who owned two Allstate agencies in the State of Indiana. Allstate terminated Plaintiff Verbarg's contracts for his agencies on or about August 4, 2020. Plaintiff Verbarg is a member in good standing of NAPAA. Plaintiff Verbarg brings Counts V, VIII, and IX to this action.

10. Plaintiff Ross Shales was an EA who owned four Allstate agencies in the State of Louisiana. Allstate terminated the contracts for his agencies on or about April 21, 2020. Plaintiff Shales is a member in good standing of NAPAA. Plaintiff Shales brings Counts VI and X to this action.

11. Plaintiff Brad Rehonic was an EA who owned an Allstate agency in the State of

Georgia. Allstate terminated the contract for his agency on or about July 27, 2020. Plaintiff Brad Rehonic is a member in good standing of NAPAA. Plaintiff Brad Rehonic brings Count VII to this action.

12. Plaintiff Joseph Rehonic was an EA who owned two agencies in the State of Georgia. Allstate terminated the contracts for his agencies on or about July 27, 2020. Plaintiff Joseph Rehonic is a member in good standing of NAPAA. Plaintiff Joseph Rehonic brings count XI to this action.

13. Defendant Allstate Insurance Company is incorporated in the State of Illinois and maintains its principal place of business in the State of Illinois. It is a citizen of the State of Illinois pursuant to 28 U.S.C. § 1332.

## Facts

### I.     EA Agreement Generally

14. Allstate Exclusive Agents ("**EA(s)**") are independent contractors of defendant Allstate Insurance Company who are authorized to sell insurance policies on behalf of Allstate in exchange for commission and building a valuable book of business. EAs are not permitted to sell insurance policies from other insurance companies.[1] EA Agreement, Section I.E.

15. In order to become an EA with Allstate, all prospective EAs must enter into the R3001 (S or C) Exclusive Agency Agreement and accompanying integrated documents

---

[1] In some limited circumstances, and with Allstate's prior written approval, an EA may sell a policy underwritten by another company, cooperative industry, or government established residual market plan or facility. EA Agreement, Section I.E.

**Compl. for Inj.,**
**Decl., and Monetary Relief**                4

(collectively, "**EA Agreement**") with Allstate.[2] These integrated documents include the Exclusive Agency Independent Contractor Manual ("**Manual**"), the Supplement for the R3001 Agreement ("**Supplement**"), and Exclusive Agency Independent Contractor Reference Guide ("**Guide**"). The EA Agreement and integrated documents are attached to this complaint as Exhibits 1-4. The executed EA Agreement between Allstate and an EA forms a valid contract under the laws of the State of Illinois.

16. When an EA sells an Allstate insurance policy, the value of that policy becomes part of the EAs "book of business."

17. The express terms of the EA Agreement establish that Exclusive Agents have an economic interest in the book of business created by the Independent Contractor relationship with Allstate, based on the EA Agreement. *See Manual,* pg 38.

18. The express contract terms specify that each EA's economic interest in the book of business includes the right for EAs to sell their economic interest to an approved buyer, or to receive a termination payment from Allstate. *Id.*

19. The right to sell the economic interest in the book of business is one of the most significant benefits to the EA.

20. Often, an existing EA will be the potential purchaser of a book of business, and the EA Agreement specifically contemplates this type of transaction. The Manual states that, "A qualified R3001 Agent may be approved as a buyer of your interest in the book of business serviced by your agency." *Id.* at 39.

---

[2] The C version of the R3001 Agreement has been developed as an option for R3001 Agents who form corporations or limited liability companies. The S version is for Agents who operate as sole proprietorships.

21. The Manual also states that "[i]n order to be considered for a book purchase, the agent must meet the then current qualifications established by [Allstate]." While sales of a book of business are subject to Allstate's approval based on whether the buyer[3] is qualified, Allstate sets out objective criteria to evaluate whether a existing EA buyer is qualified. *See Id.* at 39-40.

22. This list of objective qualifications gives EAs a reasonable expectation under the EA Agreement that Allstate will at least *consider* a potential existing EA buyer of the selling EA's book of business if that existing EA meets the objective qualifications.

23. Upon information and belief, Allstate has made known to many agents that Allstate has adopted a blanket policy in some regions that they refuse to even *consider* any sale of a book of business to an existing EA, regardless of whether such a potential buyer is objectively qualified.

24. Upon information and belief, EA s have been unable to sell their books of business for market value because Allstate will not consider sales to existing EAs, regardless of being objectively qualified buyers. With a limited number of potential buyers in the market, existing EAs are often the only qualified potential buyers willing and able to buy a book of business for a fair market price.

25. As a result of Allstate's blanket policy refusal to even consider an existing EA for the purchase of a book of business, EAs, including members of NAPAA, are often forced to sell their book for far less than market value, or receive a termination payment from Allstate for far less than the full value of their economic interest.

---

[3]Allstate lists separate objective qualifying criteria depending on whether the prospective buyer is an existing Allstate Agent, or an outside buyer.

**Compl. for Inj.,**
**Decl., and Monetary Relief**                6

## II.  Allstate's Expansion of Independent Agents into EA Territories

26. Independent Agents have the ability to sell Allstate insurance policies as well as policies from other insurance companies. As noted in paragraph 14, EAs are only permitted to sell Allstate policies.

27. Over the course of conduct between Allstate and its EAs, a mutual agreement and understanding has developed that Allstate will only authorize Independent Agents to sell Allstate policies in areas unserved by EAs.

28. Allstate spokesperson April Eaton sent an email to PC360, a insurance trade publication, stating Allstate "will consider appointing independent agency owners only in rural markets where we do not deploy exclusive agents." *See* Exhibit 5.

29. The course of dealing between Allstate and its EAs, as well as statements by Allstate representatives, have created a reasonable expectation on behalf of EAs that their EA Agreement with Allstate includes a prohibition on Independent Agents being authorized by Allstate to sell policies in areas served by an EA. Allstate has a duty under the EA Agreement to comply with this reasonable expectation.

30. Upon information and belief, Allstate has authorized Independent Agents to operate in areas also served by EAs.

31. Allstate's authorization of Independent Agents in areas also served by EAs is a material breach of the EA Agreement.

32. As a result of Allstate's material breach of the EA Agreement as it pertains to the expansion of Independent Agency Channels in direct competition with EAs, EAs have lost

**Compl. for Inj.,**
**Decl., and Monetary Relief**               7

revenue and been damaged by this breach, including EAs who are members of NAPAA.

## III.    Allstate's "Poaching" of Policies from EAs Through CCC/Internet

33. Under the express terms of the Contract, Allstate "will determine in its sole discretion all matters relating to its business and the operation of the Company, including, but not limited to, the following:

      1.      The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;

      2.      The acceptance or rejection of any application;

. . .

      6.      The type and quality of customer service received by Company policyholders.

R3001C Exclusive Agency Agreement, Section I.F.

34. Allstate also retains the sole discretion to determine the agent's compensation rates, per the Agreement and the Supplement. *Id.* The Supplement explicitly states "there are three access points where new policies and added coverage endorsements may be bound—an agency, the Customer Contact Center ("**CCC**") and the Internet." *See* Supplement at 163. The Supplement contains explicit terms for "Unrepresented Policies and Customer Contact Center (CCC)/Internet Policies." *See id.* at 151. EAs can receive commissions on policies that are completed, or "bound," by either the CCC or the Internet portal if: (1) the agent "captures" the policy; or (2) Allstate "assigns" the policy to the EA.

35. The Supplement details five different category designations for assigned or captured policies bound by either the CCC or the Internet portal. *Id.* at 163-64. The Supplement does not provide a process for the EA to notify the CCC/Internet that she is currently working with a potential customer. Until "bound," no policy exists, and therefore no contract or relevant

**Compl. for Inj.,**
**Decl., and Monetary Relief**       8

commission is triggered. If Allstate assigns a policy to an EA, the EA receives a lower commission rate than she would if the EA sells the policy to the customer (roughly 2% for assigned policies vs. 9% for EA generated policies). *See id.* The Supplement does not explicitly state in which situations Allstate will assign policies to EAs.

36. Over the course of conduct between Allstate and EAs and through the implicit terms of the EA Agreement, EAs reasonably expect that if they have substantive discussions with potential customers, they should have a fair opportunity to bind the business themselves in order to receive higher commission rates, without undue interference from Allstate's CCC/Internet.

37. EAs routinely begin substantive discussions with prospective customers seeking to buy Allstate products. Many of these prospective customers come from leads that the EA pays for, through programs like Allstate's LeadVantage.

38. EAs will follow up with prospective customers, quote potential policies, and answer the prospective customer's questions, but do not always bind the policy by the close of the business day.

39. Upon information and belief, Allstate, through its CCC/Internet, regularly accesses the private computer systems of EAs after the close of the business day and on weekends, and retrieves information of prospective customers with whom the EA did not yet complete the transaction and bind coverage.

40. An EA's prospective customer will sometimes access Allstate's CCC/Internet after business hours or on weekends. A representative from the CCC/Internet then makes contact with the EA's prospective customers, completes the transaction, and binds the customer's coverage.

**Compl. for Inj.,**
**Decl., and Monetary Relief**                9

41. In instances where the CCC contacts prospective customers with whom an EA has made substantive contact and the CCC rather than the EA binds coverage, the EA loses the potential for the full commission if the EA would have been able to continue contact with the customer.

42. When Allstate binds coverage for a customer who had previous significant contact with an EA, without giving that EA the opportunity to bind the policy, Allstate breaches the implied terms of its EA Agreement when it assigns these policies to the EA at a lower commission rate.

43. As a result of the breach described in paragraph 42, EAs have lost revenue and been damaged by this breach, including EAs who are members of NAPAA.

**IV.    Implementation of "Allstate Agency Voice" Contrary to EA Agreement**

44. In 2020, Allstate announced its implementation of Allstate Agency Voice ("**AAV**"), a centralized telephone system, which is a Voice Over Internet Protocal ("**VOIP**") system to be used by all EAs for all telephone communications in each EA's agency.

45. Allstate has mandated to all EAs the implementation and use of AAV, with the system rolling out over the course of 2021 and to be implemented fully by 2022. *See* Allstate Q&A, attached as Exhibit 6.

46. Allstate requires all EAs to pay Allstate for the costs of running AAV in their agency, amounting to system implementation costs, as well as an ongoing monthly charge of $23 per line, which is deducted by Allstate directly from the EA's commissions . *See* AAV Payment Deduction Form, attached as Exhibit 7.

**Compl. for Inj.,**
**Decl., and Monetary Relief**          10

47. Upon information and belief, Allstate has stated that there is no separate contract for EAs to enter into for the AAV system, leaving the terms of the EA Agreement to govern the relationship between Allstate and EAs.

48. The express terms of the EA Agreement specifically state that the EAs are required to "supply and maintain" their own telephone systems:

> "With Agency Technology[4], agencies will be required to supply and maintain at their own expense, the necessary desktop/notebook workstation equipment, desktop/notebook workstation software, broadband internet connectivity and networking, and *telephone systems.*"

*Supplement for the R3001 Agreement, pg. 32* (Emphasis added).

49. This contractual provision confers several benefits to each EA. Firstly, EAs enjoy privacy in using their own phone system for their offices, which are used to conduct all agency business not only in selling Allstate policies, but in other communications with third parties essential to conducting business and operating an office. Second, EAs enjoy the ability to use the telephone provider of their choosing and applicable rates, and set up equipment as preferred by the agency.

50. Upon information and belief, Allstate can monitor all calls to and from EAs via AAV.

51. EAs cannot choose their own telephone provider with each provider's applicable rates because Allstate mandates AAV's use.

52. Allstate's AAV mandate breaches the express terms of the EA Agreement–EAs no longer "supply and maintain" their own telephone systems at their own expense. Now, EAs don't

---

[4]"The Supplement defines "Agency Technology" as "any technology utilized by agencies to transmit and process insurance and Company business." *Supplement, pg. 32.*

**Compl. for Inj.,**
**Decl., and Monetary Relief**                    11

supply the telephone system. They don't maintain the telephone system. The only provision of

the EA Agreement as it relates to telephone system that Allstate still enforces is that AAV is still

at the EAs "own expense."

53. Allstate threatens to terminate the EA's ability to bind business, or to terminate the

EA's agency altogether, if the EA does not implement AAV. *See* Letter of Understanding,

attached as Exhibit 8.

54. Although Allstate threatens termination, Allstate does not provide a functioning

method to answer EA's questions about how to implement AAV. Upon information and belief,

EAs who have tried to connect with Allstate to ask questions about AAV implementation have

been unable to obtain timely, satisfactory assistance.

55. Allstate's mandate of AAV is a breach of contract, and it has damaged EAs, including

NAPAA members, in two ways: (1) by increasing their cost of doing business, and (2) by losing

their agency altogether if AAV is not implemented, even if Allstate's failure to provide AAV

support is cause for the implementation delay.

**V.      Allstate's Interference in Agency Sales Contrary to EA Agreement**

56. The EA Agreement makes clear that agents have the option to sell their economic

interest to an approved buyer, or to receive a termination payment.

> Subject to the terms and conditions set forth in the R3001 Agreement, the
> Supplement, and this Manual, you may transfer your economic interest in the
> business written under the R3000 and/or R3001 Agreement upon the termination
> of your agency relationship with Allstate by either:
>
> 1. Selling your economic interest in the business to an approved buyer
>
> 2. Electing the termination payment.

*EA Independent Contractor Manual,* pg 38.

57. Upon termination of the EA agreement, an EA has 90 days to find an Allstate-approved buyer for their economic interest, reach an agreement with that buyer, and close the sale with that buyer. *See id.* at 32-38. If the agent does not sell his or her economic interest within that 90-day window, he or she will receive the termination payment ("**TPP**"), which is generally less than 50% of the sale value of the economic interest.

58. The EA Agreement also states multiple times that Allstate is allowed broad discretion in approving or denying sales.

> The Company shall have the right to approve or disapprove the sale of the economic interest in the book at any time up until the time the transfer of the economic interest has occurred.

*Id.* at 39.

59. The EA Agreement emphasizes that Allstate is to have no involvement in an agency sale, except to approve or deny the sale.

> In sale of agency situations, Allstate is never the buyer or seller. The only times Allstate is involved is to approve the buyer and when you elect to receive the termination payment. If you elect to sell, you do not receive the termination payment from Allstate. It is your responsibility to establish a value and negotiate the sale price for your economic interest in any of the business included in the transfer.

*Id.* at 41.

### A.     Allstate's Interference in the Sale of Agent Verbarg's Agencies

60. After fifteen years as an Allstate employee, primarily in claims and leadership development, Plaintiff Verbarg terminated his employee status and entered Allstate's New Agent Training Program.

61. For ten years, Plaintiff Verbarg built a robust Allstate book of business. Plaintiff invested money back into his growing business, hiring staff, training, and investing in aggressive marketing campaigns.

62. Plaintiff Verbarg earned many Allstate achievement milestones, including: Inner Circle Elite, Leaders Forum, Top in Territory (new business auto), National Conference, Honor Ring, and Circle of Champions.

63. On or about August 4, 2020, Allstate terminated Plaintiff Verbarg's contracts for his agencies for cause.

64. The fair market value of Plaintiff Verbarg's book of business was valued at $ 1.6 million based upon commonly accepted agency valuation techniques.

65. Upon Allstate's notice of termination, Plaintiff Verbarg immediately started to seek buyers for his economic interest in two profitable Allstate agencies.

66. Within days of Plaintiff Verbarg's termination, he was contacted by four separate Allstate employees, who all inquired about purchasing his agencies.

67. One of the Allstate employees also mentioned that Greg Taphorn, a seasoned Farmer's Insurance Agent, might be interested in purchasing Plaintiff Verbarg's agencies.

68. Over the course of the next several weeks, Plaintiff Verbarg and Mr. Taphorn had detailed discussions on value of the agencies, terms of sale, and Plaintiff Verbarg provided Mr. Taphorn with a significant amount of financial data to support the valuation of his economic interest in the agencies.

69. During Plaintiff Verbarg's negotiations with Mr. Taphorn, various Allstate

**Compl. for Inj.,**
**Decl., and Monetary Relief**           14

employees, including the Jeff Riley, Plaintiff Verbarg's Field Sales Leader ("**FSL**"), told Plaintiff

Verbarg that Allstate would be very unlikely to approve the sale of both agencies to Mr. Taphorn.

70. Around the same time, Ryan Owens, another Allstate FSL, expressed an interest in

purchasing the agencies.

71. Mr. Owens also told Plaintiff Verbarg that Allstate would be unlikely to approve the

sale of both agencies to Mr. Taphorn.

72. Due to the uncertainty surrounding the sale of the agencies to Mr. Taphorn, and given

the short 90-day window to sell his economic interest, Plaintiff Verbarg began negotiating with

Mr. Owens for the purchase of both agencies.

73. Plaintiff Verbarg's initial asking price for the sale to Mr. Owens was $1.3 million.

74. Plaintiff Verbarg was aware that Mr. Owens had frequent conversations with

Allstate's Field Vice President, Troy Hawkes. Mr. Owens and Mr. Hawkes had known each other

for years, and had a personal friendship, as both had played college basketball.

75. Upon information and belief, Mr. Hawkes "coached" Mr. Owens on how to secure a

more favorable deal for the sale, in direct violation of the EA Agreement.

76. In large part due to Mr. Hawkes' coaching, the agreed upon agency sale price between

Plaintiff Verbarg and Mr. Owens was $1,100,000, with $900,000 paid at closing, and the

remaining $200,000 in the form of a promissory note whereby Mr. Owens agreed to pay Plaintiff

Verbarg in 48 monthly installments. Mr. Owens' payments on this promissory note are not

scheduled to begin until November 2024. Under other circumstances, Plaintiff Verbarg would

not have agreed to accept Mr. Owens' promissory note under such terms, as the chances Plaintiff

**Compl. for Inj.,**
**Decl., and Monetary Relief**      15

Verbarg will actually receive this money is lower. However, given the rapidly approaching deadline for the sale of his agencies and the circumstances underlying Mr. Owens' negotiations, Plaintiff Verbarg thought he had no choice but to accept these terms.

77. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when its employee, Mr. Hawkes interfered in the negotiations. Because of this material breach, Plaintiff Verbarg suffered damages in excess of $500,000.

**B.      Allstate's Interference in the Sale of Plaintiff Ross Shales' Agencies**

78. Plaintiff Shales owned four agencies in Louisiana—the "**Mandeville Agency**," the "**Metairie Agency**," the "**New Orleans Agency**," and the "**Clearview Agency**."

79. In late summer of 2019, Plaintiff Shales began negotiating with another EA, Brian Mustin, to purchase the Mandeville Agency. The starting price for the Mandeville Agency was $1 million, but Plaintiff Shales believes he and Mr. Mustin would likely have settled for at least $1.1 million after a review of the non-Allstate, brokered products.

80. Even though Mr. Mustin owns one of the largest books of business in Louisiana and has regularly performed at a high level, Allstate denied this sale. A little over four months after denying Mr. Mustin's purchase of Plaintiff Shales' agency, Allstate then approved Mr. Mustin's purchase of other agencies.

81. In September of 2019, Plaintiff Shales and Paul Caro began negotiating for Mr. Caro's purchase of the Mandeville Agency, for a similar price. Once again, Allstate would not approve Mr. Caro's purchase. Three months later, Mr. Caro's agency would finish the year rated

as the 15th best agent for performance in the five-state region.

82. Upon information and belief, Allstate wanted a specific agent, Ms. Nazha Hadi, to purchase Plaintiff Shales' Mandeville Agency and denied the other agents' offers to purchase so that Ms. Hadi would have the opportunity to negotiate a purchase of the Mandeville Agency.

83. Plaintiff Shales and Ms. Hadi began negotiations for her purchase of the Mandeville Agency, but she would present incredibly low offers to Plaintiff Shales. Plaintiff Shales and Ms. Hadi did not reach an agreement for purchase of the Mandeville Agency.

84. In early 2020, Paul Caro was approved to buy the Mandeville Agency. However, Allstate had made a major compensation change since the previous negotiations, which impacted the economic value. Plaintiff Shales and Mr. Caro arrived at a sales price and a purchase agreement, and Mr. Caro moved forward with his loan application. The sale date was set for May 1, 2020.

85. As May 1 approached, Plaintiff Shales contacted Mr. Caro to confirm the sale was moving forward. Mr. Caro informed Plaintiff Shales that their FSL, Doug Caminita, called Mr. Caro about another agency for sale for substantially less than the agreed upon price for the Mandeville Agency. Subsequent to receiving this call from FSL Caminia, Mr. Caro dropped out of the deal for the Mandeville Agency and entered negotiations with another selling agent.

86. On or about April 21, 2020, Allstate terminated Plaintiff Shales' contracts for his agencies, and agreed to give him until August 1, 2020, to sell his economic interests in his agencies.

87. Plaintiff Shales owned four and Allstate informed him that it would only allow him to

**Compl. for Inj.,**
**Decl., and Monetary Relief**                    17

sell the largest agency, the Metairie Agency, if it was split into two separate agencies. This meant that Plaintiff Shales had to achieve five agency sales in approximately 100 days.

88. Allstate only presented six eligible buying agents for these five sales and made it clear no one else would be approved to purchase the agencies.

89. Allstate limited the pool of potential buyers for five agencies to only six people, which interfered with Plaintiff Shales' ability to sell all of his agencies. Plaintiff Shales was able to sell the Metairie Agency in two parts and the Mandeville Agency. Plaintiff Shales could not sell the New Orleans Agency or the Clearview Agency and was forced to take TPP on these agencies. Because of the nature of the Clearview Agency, Agent Shales ended up receiving virtually nothing in compensation for the Clearview Agency.

90. Generally, when EAs sell their agencies, they require the buying agent to assume the remainder of any lease, if applicable, for the agency in question. Because Allstate limited Plaintiff Shales' selling options so drastically, he was left with the prospect of paying rent or lease buyout costs at three locations.

91. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when it denied otherwise eligible buyers in order to direct negotiations toward Ms. Hadi. Allstate breached the contract when it interfered with the negotiations between Plaintiff Shales and Mr. Caro by directing Mr. Caro to another, less expensive agency. Allstate breached the contract when it presented a limited pool of buyers for Plaintiff Shales' four agencies, forced him to split one agency into two, and made it clear no other buyers would be approved. Because of

Allstate's material breach, Plaintiff Shales suffered damages in excess of $500,000.

    **C.**    **Allstate's Interference in the Sale of Plaintiff Brad Rehonic's Agency**

    92. Plaintiff Brad Rehonic became an EA in January of 2020, opening a "scratch" agency[5] under Allstate's Enhanced Compensation Plan ("**ECP**").

    93. Plaintiff Brad Rehonic's agency took off fast—he wrote $2.5 million in policies in six months. Those sales would reasonably translate into a book of business worth over $4 million, given time to mature.

    94. Because Plaintiff Brad Rehonic's business was subject to the ECP, Allstate was paying him more in commissions than it was paying other agents. Upon information and belief, Allstate realized the ECP plan was costing it too much money and began looking for reasons to terminate agencies under the ECP.

    95. In late June, Allstate informed Plaintiff Brad Rehonic that his EA Agreement would be terminated without cause on November 1, 2020. Plaintiff Brad Rehonic immediately began looking for a buyer for his agency.

    96. Plaintiff Brad Rehonic's agency had entered into the Integrated Services Agreement ("**IS**") with Allstate. Not all agencies were required to enter IS—Allstate broadly publicized that pre-existing agencies with books of business over $1.5 million did not have to enter IS.

    97. Plaintiff Brad Rehonic negotiated the sale of his agency with an existing EA who had an active knowledge and involvement of Allstate's regional management. The buyer was not part of IS and did not intend to enter into IS with Allstate. As the buyer's existing book of business

---

    [5] A scratch agency is an agency started by an agent who begins selling policies, but who does not buy an existing book of business.

was over $1.5 million, he was not required to enter into IS with Allstate. Plaintiff Brad Rehonic presented a letter of intent from this buyer to Allstate on August 27, 2020. All parties, including Plaintiff Brad Rehonic's Allstate management team, knew that the buyer did not intend to enter into IS for this agency purchase.

98. Allstate approved the sale. Allstate began the process of "porting" Plaintiff Brad Rehonic's phone number and information from IS to the buyer. The IS representative told Allstate that once a book of business is on IS, there was no way to remove it from IS even if the book of business was over the $1.5 million threshold. Over the entire course of dealing under the EA Agreement, this inability to remove a book of business from IS was never agreed upon, and Allstate's management approved this sale with full knowledge that the sale would not be subject to IS.

99. On October 5, 2020, Allstate informed Plaintiff Brad Rehonic that it would not approve the sale if the buyer would not enter IS. The buyer would not enter IS, so the sale did not move forward and Plaintiff Brad Rehonic was left with less than a month to sell the agency. Given the circumstances surrounding the approval, then rejection of the previous sale, he asked for an extension, but Allstate refused. Upon information and belief, Plaintiff Brad Rehonic knows of other agents who have received extensions, for various reasons.

100. Upon information and belief, Plaintiff Brad Rehonic's FSL told other interested parties, including Cory Rickman, not to buy the agency.

101. Plaintiff Brad Rehonic entered negotiations to purchase his agency with Colby Gaskins, who was a staff member for his father, who was another EA. Allstate would not

approve this sale, and Allstate management stated they believed Mr. Gaskins' father was the "actual" buyer and was trying to "dodge" IS. In addition, Allstate said it would not approve the sale because the book of business was already slated to be assigned to another agent.

102. Plaintiff Brad Rehonic's book of business was assigned to an agent that was on Allstate's Regional Advisory Board (this is a board of agents who advise Allstate on business trends and developments within agencies). Upon information and belief, the assigned agent was not on IS, so the whole reason behind Allstate's denial of the sale to the first EA was baseless.

103. Because Plaintiff Brad Rehonic was a scratch agent for less than five years, he was not "vested" under the terms of his agreement and was ineligible for TPP.

104. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when it denied an otherwise eligible buyer on the basis of IS, while later assigning the book of business to an agent not on IS. In addition, Allstate breached the EA Agreement when Plaintiff Brad Rehonic's FSL told Mr. Rickman not to buy the agency.

105. Plaintiff Brad Rehonic planned to continue growing his agency for years to come. Because of Allstate's breach, Plaintiff Brad Rehonic suffered monetary damages equal to his reasonably expected income, plus the additional value a larger book of business would have reasonably netted in a future sale. These losses total over $500,000.

**VI.    Allstate's Bad Faith Denial of the Sale of Plaintiff Verbarg's Agencies**

106. Plaintiff Verbarg re-alleges and incorporates by reference paragraphs 1-105.

107. Good faith and fair dealing is an implied contract term that exists in all contracts.

*McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287, ¶ 19.

108. When a contract "specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* (internal citations omitted).

109. Allstate is allowed broad discretion in approving or denying sales. "The Company shall have the right to approve or disapprove the sale of the economic interest in the book at any time up until the time the transfer of the economic interest has occurred." Manual at 39.

110. Because Allstate has broad discretion in approving or denying agency sales, its discretion must be exercised with good faith and fair dealing.

111. EAs should be able to reasonably expect that under the EA Agreement, Allstate will approve an objectively qualified buyer to purchase his or her book of business.

112. Even though Mr. Taphorn was an objectively qualified buyer for Plaintiff Verbarg's book of business, Allstate FSL Riley informed Plaintiff Verbarg that Mr. Taphorn would not be approved to buy his agencies.

113. Upon information and belief, Allstate's management, including Mr. Hawkes, wanted Mr. Owens to buy Mr. Verbarg's agencies, in large part because of the preferential personal friendship and relationship between Mr. Hawkes and Mr. Owens.

114. Allstate breached its duty of good faith and fair dealing when it discouraged the sale of Plaintiff Verbarg's agencies to an objectively qualified buyer in favor of a less qualified buyer

on the basis of a personal relationship or friendship.

115. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to exercise its broad discretion in approving or denying sales in good faith and with fair dealing. Allstate breached the contract when its employees, discouraged the sale of Plaintiff Verbarg's agencies to an objectively qualified buyer in favor of a less qualified buyer on the basis of a personal relationship or friendship. Because of this material breach, Mr. Verbarg suffered damages in excess of $500,000.

## VII. Allstate's Unjust Terminations for Cause

116. Good faith and fair dealing is an implied contract term that exists in all contracts. *McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287, ¶ 19.

117. When a contract "specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* (internal citations omitted).

118. Allstate has broad discretion to terminate an EA Agreement, with cause, "immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination." *Allstate R3001C Exclusive Agency Agreement,* Section XVII, Termination of Agreement at 8-9.

**Compl. for Inj.,
Decl., and Monetary Relief**          23

119. Because Allstate has broad discretion in terminating an EA agreement, its discretion must be exercised with good faith and fair dealing.

120. EAs should be able to reasonably expect that under the EA Agreement, Allstate will not terminate an EA's agency for arbitrary and capricious reasons, or for minor infractions that are corrected and that are common under the ordinary course of dealing.

A.    **Plaintiff Verbarg's Termination for Cause**

121. Plaintiff Verbarg re-alleges and incorporates by reference paragraphs 1-121.

122. On or about August 4, 2020, Allstate gave notice that Plaintiff Verbarg's EA Agreement was being terminated for cause.

123. Allstate's stated "for cause" reason for the termination was related to issues surrounding June Fleming's homeowner's policy.

124. In 2017, Ms. Fleming bought a homeowner's policy that did not include an endorsement for water and sewer backup. Due to miscommunications between Plaintiff Verbarg's staff and  Ms. Fleming, she thought she had this endorsement.

125. In 2018, Ms. Fleming attempted to file a claim that would only be covered if her homeowner's policy had the water and sewer backup endorsement.

126. Ms. Fleming was distressed to discover her claim would not be covered and complained to Allstate about the situation.

127. After investigating, Allstate decided to bind the coverage and issued a policy with a date effective to Ms. Fleming's original policy purchase date. Thus, this matter was fully resolved to both Allstate's and the customer's satisfaction on or around July of 2018.

128. This type of retroactive coverage and customer service resolution is very common in the insurance business and is typically referred to as a "Level 1" event. Over the course of dealing between Allstate and EAs, Level 1 events are generally regarded as minor and do not lead to an agency's termination.

129. Two years after the issue with Ms. Fleming's policy had been resolved, Allstate used it as a basis for terminating Plaintiff Verbarg's agencies for cause.

130. Allstate's termination of Plaintiff Verbarg's agencies for cause nearly two years after the (fully resolved) "violation" was a breach of its duty to act in good faith and with fair dealing. Allstate's termination of Plaintiff Verbarg's agencies was arbitrary and capricious and contrary to Plaintiff Verbarg's reasonable expectations under the EA Agreement, given the course of dealing between the parties.

131. In addition, after terminating Plaintiff Verbarg for cause, Allstate "clawed back" the bonuses he earned in 2020 that were awarded based upon results achieved for the 2019 calendar year, and which were wholly unrelated to the sale at issue. Because of this claw back provision in the EA Agreement, Allstate demanded Plaintiff pay back bonuses totaling $ 99,599.55.

132. Plaintiff Verbarg planned to continue growing his agencies for years to come. Because of Allstate's breach, Plaintiff Verbarg suffered monetary damages equal to his reasonably expected income, plus the additional value a larger book of business would have reasonably netted in a future sale, plus the bonus claw back. These losses total over $500,000.

**B.      Plaintiff Shales' Termination for Cause**

133. Plaintiff Shales re-alleges and incorporates by reference paragraphs 1-132.

134. On April 21, 2020, Allstate terminated Plaintiff Shales's EA Agreement for cause, for "reasons that include but are not limited to, conflict of interest and outside financial interest." *See* Shales Termination Letter, Attached as Exhibit 9.

135. As an EA, Plaintiff Shales could only sell business outside of Allstate if Allstate allowed him to do so.

136. Every state has government-backed programs that work with properties that otherwise would not be insurable. Louisiana's FAIR plan is an example of this type of program. This FAIR plan is not associated with Allstate.

137. In Louisiana, several insurance companies entered the market by taking these FAIR policies—this practice was called "depopulation." Allstate did not participate in depopulation.

138. Plaintiff Shales had a number of these FAIR "service only" contracts.

139. Allstate had no ownership or contractual interest in these FAIR policies.

140. Plaintiff Shales' wife owned an independent agency. Plaintiff Shales sold his interest in these service only FAIR policies to his wife's agency.

141. Upon information and belief, Plaintiff Shales' sale of the FAIR policies to his wife's agency formed the basis for Allstate's termination of his agencies for cause. Allstate's termination of Plaintiff Shales' agencies for cause was a breach of the EA Agreement because it did so based upon matters wholly unrelated to policies it had any contractual right to control.

142. Because of Allstate's breach of the EA Agreement, Plaintiff Shales suffered monetary damages equal to his reasonably expected income, plus the additional value a book of business would have reasonably netted in a future sale, plus the costs associated with the leases.

**Compl. for Inj.,**
**Decl., and Monetary Relief**              26

These losses total over $500,000.

       **C.**    **Plaintiff Joseph Rehonic Termination for Cause**

143. Plaintiff Joseph re-alleges and incorporates by reference paragraphs 1-142.

144. Plaintiff Joseph Rehonic owned two Allstate agencies. His first book of business was valued at $5.2 million and would generally have been expected to sell for $1.4 - $1.5 million. His second book of business was subject to the ECP and was valued at $2.6 million and would generally have been expected sell for about $390,000.

145. Plaintiff Joseph Rehonic's wife owned an independent insurance agency. Allstate's management knew that his wife owned this agency and never expressed concerns about this to Plaintiff Joseph Rehonic. This situation was not uncommon—other EAs also had spouses or other relatives that were independent agents. Plaintiff Joseph Rehonic's manager told him this would not be a problem as long as no improper referrals were made and transactions remained at arm's length—Plaintiff Joseph Rehonic always made sure this was the case.

146. Upon the advice of Plaintiff Joseph Rehonic's accountant, Plaintiff Joseph Rehonic had his wife on his payroll. Upon information and belief, this practice was common in other agencies and was generally accepted.

147. On July 27, 2020, Allstate gave notice to Plaintiff Joseph Rehonic that it was terminating his EA Agreement for cause, based primarily on his payroll arrangement with his wife.

148. Allstate investigated Plaintiff Joseph Rehonic and never found any evidence that he referred business to his wife's agency in violation of the EA Agreement.

149. Plaintiff Brad Rehonic is Plaintiff Joseph Rehonic's son. Until Plaintiff Brad Rehonic bought his own agency, he was a top sales producer for Plaintiff Joseph Rehonic's agency. When Plaintiff Brad Rehonic bought his own agency, he hired some of Plaintiff Joseph Rehonic's employees to service his new agency. Plaintiff Brad Rehonic also used Plaintiff Joseph Rehonic's agency location to train his future employees. Allstate's management was well aware of all of the circumstances.

150. Upon information and belief, Allstate also terminated his agencies due to the short period of time when his employees were being trained and transitioning to Plaintiff Brad Rehonic's new agency.

151. Allstate knew and accepted that Plaintiff Joseph Rehonic's wife ran an independent agency. The payroll arrangement with Plaintiff Joseph Rehonic's wife was common practice. Allstate knew and accepted the training and transition of Plaintiff Joseph Rehonic's employees to Plaintiff Brad Rehonic's new agency. This course of dealing established that Plaintiff Joseph Rehonic had a reasonable expectation that all of these practices were acknowledged and allowed under his EA Agreement.

152. Allstate's termination of Plaintiff Joseph Rehonic's agencies for cause was a breach of the EA Agreement because it did so against his reasonable expectations under the contract.

153. Because of Allstate's breach of the EA Agreement, Plaintiff Joseph Rehonic suffered monetary damages equal to his reasonably expected income, plus the additional value a book of business would have reasonably netted in a future sale. These losses total over $500,000.

**Compl. for Inj.,**
**Decl., and Monetary Relief**          28

**COUNT I:**
**Breach of Contract[6] Based on the Terms of the EA Agreement**
**for Allstate's Blanket Policy to Not Consider Existing Allstate Agents for Agency Sales**

154. Plaintiff NAPAA re-alleges and incorporates by reference the preceding paragraphs 1-153.

155. The EA Agreement is a valid and enforceable contract, and Allstate has a duty to honor all express and implied terms therein.

156. Under the express terms of the EA Agreement, EAs have a reasonable expectation that they will be able to sell their economic interest in their book of business to an objectively qualified buyer without devaluation that would deny them the benefit of the bargain.

157. Other existing EAs are objectively qualified to purchase Allstate books of business, as existing EAs have already been approved by Allstate to sell Allstate insurance policies and have met all objective criteria set forth by Allstate in the EA Agreement.

158. While Allstate has discretion in considering whether to approve a sale, Allstate has made known to many EAs that Allstate has enacted a blanket policy in which Allstate refuses to even consider approving sales of a book of business to any existing EAs.

159. Rather than considering and subsequently approving or denying a proposed buyer, Allstate refuses to even *consider* an existing EA as a buyer.

160. Allstate's blanket refusal to consider sales to objectively qualified existing EA

---

[6] The elements of a breach of contract claim are (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resultant injury to the plaintiff. *Pepper Const. Co. v. Palmolive Tower Condominiums,* LLC, 59 N.E.3d 41 (Ill. App. Ct. 2016)

**Compl. for Inj.,**
**Decl., and Monetary Relief**          29

buyers is a breach of the EA agreement, violates the reasonable expectations of the parties, and denies one party the benefit of the contract.

161. Allstate's refusal to consider sales to existing EAs has resulted in EAs being forced to dispose of their economic interest for far less than market value, thereby harming the EAs, including NAPAA members. With a limited number of potential buyers in the market, existing EAs are often the only qualified potential buyers willing and able to buy a book of business for a fair market price.

162. Allstate's breach of the EA agreement is the direct cause of economic harm to the EAs, including NAPAA members.

**COUNT II:**
**Breach of Contract Based on Course of Dealing[7]**
**for Allstate's Expansion of Independent Agents into EA Territories**

163. Plaintiff NAPAA re-alleges and incorporates by reference the preceding paragraphs 1-162.

164. Allstate and its EAs have created an implied term in contract through a course of dealing, based on a mutual agreement and understanding, as well as by explicit statements by Allstate representatives, that Allstate will use Independent Agency Channels only in areas unserved by Exclusive Agents.

165. While Exclusive Agents and Allstate have operated under this understanding and Allstate has followed this policy through its course of conduct, Allstate has violated this contractual term by expanding Independent Agency Channels into areas that are already served

---

[7]A course of dealing based on parties' conduct can supplement the express terms of a contract. *See R.O.W. Window Co. v. Allmetal, Inc.*, 367 Ill. App. 3d 749 (2006).

by EAs.

166. Allstate's expansion of Independent Agency Channels into areas already served by EAs has harmed EAs by creating direct competition with EAs thereby causing EAs to lose business.

167. Allstate's breach of this implied contract term is the direct cause of economic harm to EAs, including NAPAA members.

**COUNT III:**
**Breach of Contract Based on the Implied Terms of the EA Agreement for**
**Allstate's "Poaching" of Policies from EAs Through CCC/Internet**

168. Plaintiff NAPAA re-alleges and incorporates by reference the preceding paragraphs 1-167.

169. The EA Agreement's process for assigning policies and its lack of specificity for how and when a policy will be assigned to an EA creates an implicit contract term that EAs may reasonably expect that if they have substantive discussions with potential customers, that they will have a fair opportunity to bind the business themselves in order to receive higher commission rates, without undue interference from Allstate's CCC/Internet.

170. This implied term is necessary to effect the purpose of the contract, and to avoid denying one party the benefit of the bargain.

171. In "poaching" the EAs' prospective customers after hours and binding coverage, Allstate breaches the implied terms of the contract and denies EAs the benefit of the bargain.

172. Allstate's breach of this agreement is the direct cause of economic harm to EAs in the form of lower commissions.

## COUNT IV:
## Breach of Contract Based upon the Express Terms of the EA Agreement for Allstate's Mandate of AAV

173. Plaintiff NAPAA re-alleges and incorporates by reference the preceding paragraphs 1-172.

174. The EA Agreement expressly provides that EAs are to supply and maintain their own telephone system at the EAs expense. *See* ¶ 48.

175. Allstate breached the express terms of the EA Agreement by mandating that EAs may only use Allstate supplied and maintained AAV.

176. Allstate's breach harms EAs, including NAPAA members by: (1) increasing their cost of doing business, and (2) losing their agency altogether if AAV is not implemented, even if Allstate's failure to provide AAV support is cause for the implementation delay. *See* ¶ 48.

## COUNT V:
## Breach of Contract, for
## Allstate's Interference in the Sale of Plaintiff Verbarg's Agencies

177. Plaintiff Verbarg re-alleges and incorporates by reference the preceding paragraphs 1-176.

178. Allstate has contractual discretion in deciding whether to approve or deny agency sales, but Allstate is not authorized under the EA Agreement to interfere in the negotiations between a agency buyer and seller. *See* ¶¶ 56-59.

179. Allstate breached the contract when its employee, Mr. Hawkes, interfered in the negotiations between Plaintiff Verbarg and Mr. Owens. Because of this material breach, Plaintiff Verbarg sold his agencies for less than market value and suffered monetary damages in excess of $500,000.

## COUNT VI:
### Breach of Contract, for
### Allstate's Interference in the Sale of Plaintiff Shales's Agencies

180. Plaintiff Shales re-alleges and incorporates by reference the preceding paragraphs 1-179.

181. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when it denied otherwise eligible buyers in order to direct negotiations toward Ms. Hadi. Allstate breached the contract when it interfered with the negotiations between Plaintiff Shales and Mr. Caro by directing Mr. Caro to another, less expensive agency. Allstate breached the contract when it presented a limited pool of buyers for Plaintiff Shales' four agencies, forced him to split one agency into two, and made it clear no other buyers would be approved. Because of Allstate's material breach, Plaintiff Shales suffered damages in excess of $500,000. *See* ¶¶ 78-91.

## COUNT VII:
### Breach of Contract, for
### Allstate's Interference in the Sale of Plaintiff Brad Rehonic's Agency

182. Plaintiff Shales re-alleges and incorporates by reference the preceding paragraphs 1-181.

183. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when it denied an otherwise eligible buyer on the basis of IS, while later assigning the book of business to an agent not on IS. In addition, Allstate breached the EA Agreement when Plaintiff Brad Rehonic's FSL told Mr. Rickman not to buy the agency. *See* ¶¶ 92-104.

184. Plaintiff Brad Rehonic planned to continue growing his agency for years to come.

**Compl. for Inj.,**
**Decl., and Monetary Relief**         33

Because of Allstate's breach, Plaintiff Brad Rehonic suffered monetary damages equal to his reasonably expected income, plus the additional value a larger book of business would have reasonably netted in a future sale. These losses total over $500,000. *Id.*

## COUNT VIII:
### Breach of Contract, Premised on a Lack of Good Faith and Fair Dealing, for Allstate's Bad Faith Denial of the Sale of Plaintiff Verbarg's Agencies

185. Plaintiff Verbarg re-alleges and incorporates by reference the preceding paragraphs 1-184.

186. Allstate breached its duty of good faith and fair dealing when it discouraged the sale of Plaintiff Verbarg's agencies to an objectively qualified buyer in favor of a less qualified buyer on the basis of a personal relationship or friendship. *See* ¶¶ 106-115.

187. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to exercise its broad discretion in approving or denying sales in good faith and with fair dealing. Allstate breached the contract when its employees, discouraged the sale of Plaintiff Verbarg's agencies to an objectively qualified buyer in favor of a less qualified buyer on the basis of a personal relationship or friendship. Because of this material breach, Mr. Verbarg suffered damages in excess of $500,000. *Id.*

## COUNT IX:
### Breach of Contract, Premised on Allstate's Unjust Terminations for Cause, of Plaintiff Verbarg's Agencies

188. Plaintiff Verbarg re-alleges and incorporates by reference the preceding paragraphs 1-187.

189. Allstate's termination of Plaintiff Verbarg's agencies for cause nearly two years after

the (fully resolved) "violation" was a breach of its duty to act in good faith and with fair dealing. Allstate's termination of Plaintiff Verbarg's agencies was arbitrary and capricious and contrary to Plaintiff Verbarg's reasonable expectations under the EA Agreement, given the course of dealing between the parties. *See* ¶¶ 121-132.

190.    In addition, after terminating Plaintiff Verbarg for cause, Allstate "clawed back" the bonuses he earned in 2020 that were awarded based upon results achieved for the 2019 calendar year, and which were wholly unrelated to the sale at issue. Because of this claw back provision in the EA Agreement, Allstate demanded Plaintiff pay back bonuses totaling $ 99,599.55. *Id.*

191. Plaintiff Verbarg planned to continue growing his agencies for years to come. Because of Allstate's breach, Plaintiff Verbarg suffered monetary damages equal to his reasonably expected income, plus the additional value a larger book of business would have reasonably netted in a future sale, plus the bonus claw back. These losses total over $500,000. *Id.*

**COUNT X:**
**Breach of Contract, Premised on Allstate's Unjust Terminations for Cause, of Plaintiff Shales's Agencies**

192. Plaintiff Shales re-alleges and incorporates by reference the preceding paragraphs 1-191.

193. Upon information and belief, Plaintiff Shales' sale of the FAIR policies to his wife's agency formed the basis for Allstate's termination of his agencies for cause. Allstate's termination of Plaintiff Shales' agencies for cause was a breach of the EA Agreement because it did so based upon matters wholly unrelated to policies it had any contractual right to control. *See*

**Compl. for Inj.,**
**Decl., and Monetary Relief**                    35

¶¶ 133-142.

194. Because of Allstate's breach of the EA Agreement, Plaintiff Shales suffered monetary damages equal to his reasonably expected income, plus the additional value a book of business would have reasonably netted in a future sale, plus the costs associated with the leases. These losses total over $500,000. *Id.*

### COUNT XI:
### Breach of Contract, Premised on Allstate's Unjust Terminations for Cause, of Plaintiff Joseph Rehonic's Agencies

195. Plaintiff Joseph Rehonic re-alleges and incorporates by reference the preceding paragraphs 1-194.

196. Allstate knew and accepted that Plaintiff Joseph Rehonic's wife ran an independent agency. The payroll arrangement with Plaintiff Joseph Rehonic's wife was common practice. Allstate knew and accepted the training and transition of Plaintiff Joseph Rehonic's employees to Plaintiff Brad Rehonic's new agency. This course of dealing established that Plaintiff Joseph Rehonic had a reasonable expectation that all of these practices were acknowledged and allowed under his EA Agreement. *See* ¶¶ 143-153.

197. Allstate's termination of Plaintiff Joseph Rehonic's agencies for cause was a breach of the EA Agreement because it did so against his reasonable expectations under the contract. *Id.*

198. Because of Allstate's breach of the EA Agreement, Plaintiff Joseph Rehonic suffered monetary damages equal to his reasonably expected income, plus the additional value a book of business would have reasonably netted in a future sale. These losses total over $500,000. *Id.*

## Prayer for Relief

**WHEREFORE,** Plaintiffs pray for the relief set forth below:

1. On behalf of Plaintiff NAPAA's members, declare that Defendant Allstate is in breach of the EA Agreement by creating a blanket policy refusing to consider agency sales to existing Allstate Agents;

2. On behalf of Plaintiff NAPAA's members, declare that Defendant Allstate is in breach of the EA Agreement by expanding Independent Agency Channels into areas already served by Exclusive Agents;

3. On behalf of Plaintiff NAPAA's members, declare that Defendant Allstate is in breach of the EA Agreement by binding policies after hours through Allstate's CCC/Internet when EAs have had recent, substantial contact with the potential customer at issue;

4. On behalf of Plaintiff NAPAA's members, preliminarily and permanently enjoin Defendant Allstate from continuing a blanket policy of refusing to consider sales to existing Allstate Agents;

5. On behalf of Plaintiff NAPAA's members, preliminarily and permanently enjoin Defendant Allstate from expanding Independent Agencies into areas served by Exclusive Agents;

6. On behalf of Plaintiff NAPAA's members, preliminarily and permanently enjoin Defendant Allstate from binding policies after hours through Allstate's CCC/Internet when EAs have had recent, substantial contact with the potential customer at issue;

7. On behalf of Plaintiff NAPAA's members, declare that Defendant Allstate is in breach of the EA Agreement by forcing implementation of Allstate Agency Voice for all Exclusive

**Compl. for Inj.,**
**Decl., and Monetary Relief**          37

Agents;

8. On behalf of Plaintiff NAPAA's members, preliminarily and permanently enjoin Defendant Allstate from forcing implementation of Allstate Agency Voice for all Exclusive Agents;

9. Award Plaintiff Verbarg damages, in an amount to be determined, for Allstate's breach of contract in its interference in the sale of his agencies to an objectively qualified buyer;

10. Award Plaintiff Shales damages, in an amount to be determined, for Allstate's breach of contract in its interference in the sale of his agencies to an objectively qualified buyer;

11. Award Plaintiff Brad Rehonic damages, in an amount to be determined, for Allstate's breach of contract in its interference in the sale of his agency to an objectively qualified buyer;

12. Award Plaintiff Verbarg damages, in an amount to be determined, for Allstate's breach of contract, premised on a lack of good faith and fair dealing, for Allstate's bad faith denial of the sale of Plaintiff Verbarg's agencies;

13. Award Plaintiff Verbarg damages, in an amount to be determined, for Allstate's breach of contract in its arbitrary and capricious termination of Agent Verbarg's EA agreement with Allstate;

14. Award Plaintiff Shales damages, in an amount to be determined, for Allstate's breach of contract in its arbitrary and capricious termination of Agent Shales's EA agreement with Allstate;

15. Award Plaintiff Joseph Rehonic damages, in an amount to be determined, for Allstate's breach of contract in its arbitrary and capricious termination of Agent Joseph

**Compl. for Inj.,**
**Decl., and Monetary Relief**                    38

Rehonic's EA agreement with Allstate; and

      11. Grant any other relief this Court deems appropriate.

| | |
|---|---|
| James Bopp, Jr. IN # 2838-84* | Respectfully Submitted, |
| jboppjr@aol.com | |
| *Lead Counsel for Plaintiff* | /s/ Brent Holmes |
| Melena S. Siebert IN # 35061-15* | Brent Holmes, IL Bar No. 3122381 |
| msiebert@bopplaw.com | brent@hhlawoff.com |
| *Counsel for Plaintiff* | Heller, Holmes & Associates, P.C. |
| THE BOPP LAW FIRM, PC | 1101 Broadway Ave. |
| 1 South Sixth Street | Mattoon, IL 61938 |
| Terre Haute, IN 47807-3510 | (217) 235-2700 - Telephone |
| (812) 232-2434 - Telephone | Local Counsel |
| (812) 235-3685 - Facsimile | |
| *Pro hac vice applications forthcoming | |

## Certificate of Service

I hereby certify that on May 18, 2021, a copy of the foregoing and all attachments thereto was filed electronically using the Court's CM/ECF system and by certified mail with the appropriate Waiver of the Service of Summons forms upon:

Robert G. Lian, Jr.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006-1037

David J. Mueller
Senior Counsel
Insurance Operations Law
Law and Regulations Department
Allstate Insurance Company
2775 Sanders Rd., Suite A2E
Northbrook, IL 60062

/s/ Brent Holmes
Brent Holmes
Local Counsel for Plaintiff

**Compl. for Inj.,
Decl., and Monetary Relief**          40